IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
v.                              )        No. 3:22-CR-44-KAC-DCP
                                )
TERRENCE D. JOHNSON,            )
                                )
                Defendant.      )

## REPORT AND RECOMMENDATION

This case is before the undersigned for report and recommendation on Defendant Terrence

Johnson's Motion to Suppress [Doc. 45], filed on February 6, 2023. *See* 28 U.S.C. § 636(b).

Defendant, who is charged with drug and firearms offenses, challenges the stop and search of his

vehicle and subsequent search of his residence on Fourth Amendment grounds [Doc. 45].

On April 27, 2022, a confidential source placed an order for cocaine from Defendant by

text message. Law enforcement watched Defendant drive away from his residence and performed

a pretextual traffic stop for an alleged illegal turn. A drug detection dog alerted on Defendant's

vehicle, and a search of the vehicle yielded cocaine and marijuana. Defendant denied consent to

search his residence. Following the traffic stop, officers went to secure Defendant's residence and,

while there, talked with Aurelio Zatarain ("Zatarain")[1] outside the garage. Zatarain consented to

a search of his truck, which also contained cocaine. Law enforcement then obtained a search

warrant for Defendant's residence based in part on the controlled substances seized from the two

vehicles. Officers executed the search warrant and seized illegal drugs, a large amount of currency,

firearms, and ammunition from Defendant's residence.

---

[1]     Zatarain is the sole named codefendant in this case.

1

Defendant seeks to suppress all evidence seized from his vehicle and during the execution of the search warrant, arguing law enforcement gained this evidence in violation of his rights under the Fourth Amendment. Specifically, he maintains that the officers lacked probable cause to stop him for a traffic violation. He also contends that officers entered onto his property and investigated his garage without a warrant. He asserts that the search warrant affidavit, which contains information from the illegal stop and warrantless search, fails to provide probable cause for the warrant's issuance because the supporting affidavit does not establish the reliability of the confidential informant or a nexus between the residence and drug trafficking.

For the reasons discussed below, the Court finds that officers had reasonable suspicion to conduct an investigatory stop of Defendant's car and probable cause to search the vehicle based upon the odor of marijuana and the drug dog's alert. The Court also finds that the officer properly entered and remained on Defendant's property to prevent the destruction of evidence while awaiting a search warrant. Although the protective sweep of Defendant's garage was unlawful, evidence viewed during the sweep was also gained through lawful means. Finally, the Court finds the affidavit in support of the search warrant provides probable cause for the search of Defendant's residence. Accordingly, the Court respectfully recommends that Defendant's Motion to Suppress [Doc. 45] be denied.

## I.      BACKGROUND

Defendant Johnson is charged, along with Codefendant Zatarain, with conspiring to distribute five kilograms or more of cocaine from October 1, 2021, to April 27, 2022 (Count One) [Doc. 11]. Both Defendants are also charged with possession of five kilograms of cocaine on April 27, 2022, with intent to distribute (Count Two) [*Id.*]. Defendant Johnson is further charged with possession of firearms in furtherance of drug trafficking (Count Three) and being a felon in

2

possession of a firearm and ammunition (Count Four), both allegedly occurring on April 27, 2022 [*Id*.]. These charges arise, at least in part, from a traffic stop of Defendant's vehicle on April 27, 2022, and the subsequent search of his residence pursuant to a search warrant.

On April 27, 2022, Drug Enforcement Administration ("DEA") Task Force Officer Robert Howard ("TFO Howard") applied for search warrants for a residence and outbuildings at 144 Holston Court in Knoxville, Tennessee [Doc. 46-1 p. 1; Exh. 1[2]]. TFO Howard simultaneously applied for search warrants for a silver Honda Civic [Doc. 46-1 p. 8], a white Mercedes SL500 [*Id*. at 15], a black GMC Sierra truck [*Id*. at 22], a white Kia Forte [*Id*. at 29], and a gray Ford F-350 truck [*Id*. at 36], all of which were also located at 144 Holston Court. TFO Howard submitted a single, eleven-page affidavit in support of the six search warrants [*Id*. at 46–57]. The affidavit states that since February 2022, TFO Howard has investigated a drug trafficking organization dealing in cocaine and heroin in the Eastern District of Tennessee [*Id*. at ¶7]. According to TFO Howard, Defendant distributes cocaine, and his residence is used to store and distribute narcotics [*Id*.].

The affidavit relates that the search of another residence in April 2022, pursuant to a federal search warrant, resulted in the seizure of a large quantity of suspected cocaine and marijuana [*Id*. at ¶¶8–9A].[3] The resident ("CS2") agreed to cooperate with law enforcement and identified Defendant as his cocaine supplier [*Id*. at ¶9A]. CS2 stated that Defendant lived "at the end of Holston Court," which is where the target residence, the home of Defendant, is located [*Id.*]. Law

---

[2]      The applications, search warrants, attachments, and master affidavit, which were appended the Government's response [Doc. 46-1], were also entered as Exhibit 1 at the March 21, 2023 evidentiary hearing. The Court will cite to these documents as attachments in the docket.

[3]      TFO Howard's affidavit contains two paragraphs numbered "9." For clarity, the Court will cite to these paragraphs as "9A" and "9B."

3

enforcement confirmed this was Defendant's residence by checking utility records [*Id.* at 9B]. According to TFO Howard, on April 27, 2022, CS2 texted Defendant and placed an order for cocaine [*Id.* at ¶10]. Officers observed Defendant leave his residence to meet CS2, conducted a traffic stop, and performed a dog sniff on Defendant's vehicle [*Id.*]. The trained and certified[4] drug detection dog alerted on Defendant's vehicle, and officers searched the vehicle and seized ten ounces of cocaine and two pounds of suspected marijuana wrapped in plastic shrink wrap [*Id.*]. Defendant denied consent to search his residence [*Id.*].

The affidavit further relates that following the stop of Defendant, officers conducted a "knock-and-talk" at both Defendant's residence and his detached garage [*Id.* at ¶11]. TFO Howard stated that Zatarain walked out of the garage and, while speaking with Zatarain, officers could see the five vehicles identified above in and around the garage,[5] some with their trunks open and/or seats and interior panels removed [*Id.*]. Zatarain consented to the search of his gray Ford F-350 truck, and officers seized approximately twenty kilograms of cocaine from a toolbox in the back of the truck [*Id.*]. Based upon his training and experience, TFO Howard knows that drug traffickers keep controlled substances and paraphernalia; large amounts of currency and other proceeds; safes and keys to safety deposit boxes; weapons and ammunition; vehicles used to transport drugs and money; electronic devices used to communicate with associates; addresses, phone numbers, and photographs of associates; and records of drug trafficking at their residences [*Id.* at ¶4(d)–(j), (o)–(s)].

---

[4]     Information on the drug dog's training and certification was provided in Attachment C to the search warrant affidavit [Doc. 46-1 p. 57]. KPD Officer Justin Kellione and drug dog Oris were certified in narcotic detection in September 2021 [*Id.*].

[5]     The photograph of the Kia Forte shows it was parked outside the garage [Doc. 46-1 p. 34].

4

Based on this information, federal search warrants were issued on April 27, 2022, for Defendant's residence and the five vehicles [*Id.* at 4–7 (residence), 11–14 (Honda Civic), 18–21 (Mercedes SL500), 25–28 (GMC Sierra), 32–35 (Kia Forte), & 39–42 (Ford F-350)]. Officers seized currency, suspected controlled substances (including four kilogram "bricks" wrapped in duct tape), an Apple iPhone, five firearms, and ammunition from the residence [Doc. 46-2 pp. 2–8; Exh. 2 (search warrant return)]. Officers seized an eight-kilogram "brick," a twelve-kilogram "brick," and two ball-shaped amounts of suspected narcotics from the Ford F-350 truck [Doc. 46-3 p. 1].[6] They seized a vacuum-sealed bag of suspected cocaine from the Honda Civic [Doc. 46-2 p. 8 ].[7] No evidence was seized from the other three vehicles [Doc. 46-3 pp. 9–11].

On February 6, 2023, Defendant Johnson moved to suppress all evidence obtained and derived from the traffic stop and search of his vehicle and the subsequent search of this residence [Doc. 45]. The Government responded in opposition [Doc. 46]. The parties appeared before the undersigned on March 21, 2023, for an evidentiary hearing on the motion. Assistant United States Attorney Brent Nelson Jones appeared on behalf of the Government. Attorney Michael Thomas Cabage represented Defendant Johnson, who was also present. The Court heard the evidence and arguments presented by the parties and took the motion under advisement at the conclusion of the hearing.

## II. SUMMARY OF THE EVIDENCE

At the March 21, 2023 evidentiary hearing, the Government presented six exhibits and the testimony of TFO Howard. The Court summarizes the evidence as follows:

---

[6] An Android Samsung smartphone is listed on the inventory from the Ford F-350 as seized from a "front shirt pocket" presumably also in the truck [Doc. 46-2 p. 13].

[7] Other drugs and ammunition on the return for the Honda Civic are listed as seized from the master bedroom closet [Doc. 46-2 p. 8].

5

The Government introduced Exhibit 1, which is the applications, search warrants, and affidavit for the residence and vehicles, and Exhibit 2, which is the search warrant returns. The Government also introduced the DEA Report of Investigation of TFO Howard, prepared on April 28, 2022, and signed on May 17, 2022 [Exh. 3]. This report states that on April 27, 2022, DEA task force officers and Knoxville Police Department ("KPD") interdiction officers conducted a "traffic stop . . . as a part of an ongoing investigation" [Exh. 3 p. 1]. The driver and sole occupant declined consent to search the vehicle and a K-9 unit was called to the scene [*Id.*]. During "a free air sniff" of the vehicle, the drug dog alerted [*Id.*]. Officers searched the vehicle, located a blue backpack in the passenger seat, and seized "a vacuum sealed plastic bag containing a white powder substance believed to be cocaine . . . and two (2) large vacuum sealed bags of a green leafy substance believed to be marijuana" from the backpack [*Id.*]. The driver was arrested, and an Apple iPhone was seized from his person [*Id.* at 2]. Government's Exhibit 4 is a DEA Chemical Analysis Report of the white powder seized from the backpack, which identifies the substance as 300 grams of cocaine.

The Government also introduced a five-page KPD report of the traffic stop [Exh. 5]. As to this report, the Government proffered that KPD Officer Dylan Bradley ("Officer Bradley")[8] conducted a traffic stop of Defendant based upon information from TFO Howard and others that a confidential informant was purchasing drugs from Defendant. Although Officer Bradley told Defendant that he stopped him for an illegal left turn, this was not the reason for the stop and was not true. AUSA Jones proffered that the reason for the traffic stop was the controlled buy that was in progress, but Officer Bradley lied to Defendant and told Defendant that he stopped him for a

---

[8]    In the report, the officer is identified as "A. Bradley" [Exh. 5]. AUSA Jones identified this officer as "Dylan Bradley." He is also listed as "Dylan Bradley" in TFO Howard's report [Doc. 46-3; Exh. 4].

traffic violation. The report states that Defendant was driving a gray Toyota and the "strong odor of marijuana [was] emanating from the vehicle" upon the officers' approach and identification of Defendant [Exh. 5 pp. 3–5]

TFO Howard testified he works for the Oak Ridge Police Department and has been a DEA task force officer investigating narcotics cases for three years. He stated that he was investigating Defendant Johnson as a primary source of supply for cocaine and marijuana in Knoxville. TFO Howard developed a confidential source who knew Defendant through Defendant's wife. The confidential source identified Defendant as the person from whom he got cocaine and marijuana. The confidential source knew Defendant lived at the "dead end" of Holston Court but did not know the house number.

TFO Howard testified that the stop of Defendant and search warrant for his residence resulted from a planned operation by the DEA and KPD on April 27, 2022. He stated the plan for that day was for the confidential source to text Defendant that he was "ready to re-up," and once law enforcement identified Defendant leaving the residence, they would conduct a traffic stop of Defendant's vehicle before Defendant arrived at the confidential source's residence, which is about one mile from Defendant's residence. TFO Howard said he was with the confidential source, who texted Defendant that he was "ready and don't forget my son," which meant the confidential source wanted Defendant to bring him cocaine and marijuana. TFO Howard stated that he radioed the other officers in the operation that the order was placed. He said two officers were watching Defendant's residence on Holston Court, and Officer Bradley was also located near Defendant's residence. According to TFO Howard, he had provided Officer Bradley with the vehicle type and license tag number for Defendant's vehicle in the pre-operation briefing. TFO Howard said a K-

9 unit was also stationed nearby and available to perform a free air sniff once Defendant's vehicle was stopped.

The Government then played a ten-minute clip from the video recording of the traffic stop, taken from the dash camera of Officer Bradley's patrol car [Exh. 6].[9] The video reveals that approximately thirty seconds from the start of the recording, Officer Bradley stops Defendant's vehicle [*Id*. at 15:00:22]. Officer Bradley and his partner approach Defendant's vehicle, one at each of the front side windows [*Id*. at 15:00:37]. Approximately thirty seconds later, Officer Bradley opens the door of Defendant's vehicle, removes Defendant from the car, and handcuffs him [*Id*. at 15:01:01–28]. Officer Bradley moves Defendant to the front passenger corner of his patrol car and frisks him, removing items from his pockets and placing them on the hood of the patrol car [*Id*. at 15:01:43–15:02:07]. Defendant is then moved out of view of the camera [*Id*. at 15:02:20]. Two and one-half minutes after Defendant was stopped, the K-9 unit performs a sniff of Defendant's car, and the dog sits and then lies down near the driver's door [*Id*. at 15:02:52–15:03:00]. Immediately thereafter, the officers begin searching Defendant's car [*Id*. at 15:03:20]. Six and one-half minutes after Defendant was stopped, an officer removes two packages of a green substance and one clear plastic bag containing a white substance from a blue backpack, which he took from the car and placed in front of the camera [*Id*. at 15:07:42–15:08:12].

TFO Howard stated that he arrived at the scene of the traffic stop after Defendant's car had been searched and marijuana and cocaine seized. He said he went to Defendant's residence on Holston Court before going to obtain the search warrant. TFO Howard said officers at the residence told him what had happened at that location. The officers went to the door of

---

[9]     This video contains minimal audio, primarily of statements on the radio inside the patrol car.

8

Defendant's residence to see if anyone was home. No one came to the door, but the officers saw an individual standing on the hill overlooking the garage and watching them. The officers then engaged the individual to identify him and ask if he lived at the residence. TFO Howard testified that he included the information from the officers about the individual in his affidavit. He said he then prepared an affidavit and submitted it to the judge. TFO Howard said the information in the affidavit accurately relates the events on and leading up to April 27, 2022.

TFO Howard said after obtaining the search warrant, he executed a search of Defendant's residence, the vehicles inside the garage, and the vehicle outside of the garage for which an individual had given consent. He agreed that guns and drugs were seized during the search.

On cross-examination, TFO Howard agreed he was the lead agent investigating this case. He said he was the officer who spoke with the confidential source at the time the source identified Defendant as his supplier. He said this conversation was one week to ten days before the April 27, 2022 search. TFO Howard said the confidential source's demeanor and the fact that the source discussed his children caused him to believe the source was being truthful. He said to test the reliability of the confidential source and to identify the supplier, whom the source referred to as "T," he obtained the confidential source's telephone records and identified "T" as Terrence Johnson. He also determined the house number of the residence at the end of Holston Court and who lived at that residence. TFO Howard said the confidential source did not say he had been inside Defendant's house and could not give the street number, but the confidential source provided the exact location of Defendant's residence. He said this location turned out to be correct. He said he was able to identify "T" as Defendant from the telephone number the confidential source had for "T," as well as from other DEA resources.

9

TFO Howard agreed that the stop of Defendant's vehicle was not a random stop. He stated that in the pre-operation briefing, he described Defendant's car to Officer Bradley, told him Defendant would be transporting narcotics from his residence to the confidential source's residence, and asked him to stop Defendant before he arrived. TFO Howard said he was with the confidential source at the start of the operation and observed the text, "I'm ready and don't forget my son," from the confidential source to Defendant. He said on the video, he heard an officer say "10-15," which means the person is in custody. He stated the video also reveals an officer mentioned the strong odor of marijuana coming from Defendant's vehicle. TFO Howard said that when the dog sits in the video, that is a positive alert. He said he arrived on the scene near the end of the ten-minute clip, and after observing what had been seized, opened the door of the patrol car and advised Defendant of the *Miranda* warnings.

TFO Howard stated that officers "knocked and announced" at Defendant's residence but no one answered the door. He said, while standing outside, another task force officer observed a Hispanic male standing above them at the garage door looking down at the officers from an open door. TFO Howard said he believed TFO Lichty included in his report that he (Lichty) knocked on the door to the garage and the codefendant came to the door. According to TFO Howard, once the officers walked to the back side of the garage, it was "wide open." He said the officers spoke with the codefendant and asked him why he was there. The codefendant reported he was there to build a retaining wall, but he could not identify anyone who lived at the residence. TFO Howard said the codefendant's explanation of his presence did not make sense to the officers. He stated that the officers observed the Texas license tags on the codefendant's truck and asked the codefendant for identification. He agreed that the officers understood the codefendant did not have authority to consent to a search of the residence or the garage but only his truck.

10

TFO Howard said after he arrived at the residence, he walked through the garage, looking into the vehicles to make sure no one was in them. He stated that least one and maybe two of the vehicles were outside and either four or five were inside the garage. While walking through the garage, he observed a package in the backseat of the Honda Civic that was in "plain view" and appeared to contain narcotics based upon the way it was packaged. He stated that the Civic was inside the open garage. TFO Howard said one side of the garage was open like an aircraft hangar, and the Hispanic male's truck was partially inside the garage. He stated that the Hispanic male spoke English and consented to a search of his truck. He said the officers found twenty packages of cocaine in a metal toolbox with a false bottom, located in the back of the truck. TFO Howard said the Hispanic male was cooperative and showed the officers how to open the false bottom of the toolbox. He stated that no video or audio recordings of the officers' interaction with the man existed. He said the officers were wearing DEA jackets or vests or other attire clearly marked as police. TFO Howard said he was present for the officer's search of the false bottom of the toolbox but left after that to obtain a search warrant.

TFO Howard testified that he did not disclose the name of the confidential source to the issuing judge. He did not recall telling the judge that he verified the information from the confidential source through "phone dumps." He agreed that the affidavit states he verified through Knoxville Utility Board that the utilities for the residence were in Defendant's wife's name. He also agreed that the confidential informant told him that he knew Defendant through Defendant's wife. TFO Howard said the confidential source used the lawn service operated by Defendant's wife and her father. He said he believed the residence contained contraband because the Honda Civic in the garage, which had the package of suspected narcotics on the backseat, was registered to Defendant at the address of the residence. He said he also believed the residence contained

contraband because officers saw Defendant leave the residence before coming to meet the confidential source. He stated that while he was seeking the search warrant, Defendant's wife and her father arrived at the residence and talked with agents outside.

TFO Howard said he was not present for the start of the execution of the search warrant, but he was present when officers were cataloguing the evidence seized from multiple rooms. He said evidence was mainly seized from three rooms: Officer seized marijuana and firearms from Defendant's and Mrs. Johnson's bedroom ("the master bedroom"), they seized multiple kilograms of cocaine along with marijuana and firearms from a closet (or adjoining small bedroom) off the master bedroom, and officers seized a large amount of currency from a third room. TFO Howard said Defendant's wife confirmed that she and Defendant shared the master bedroom when he debriefed her at the scene. He believed someone had been staying in the third room because the bed looked slept in and the room contained clothing. He stated that Defendant's wife provided vague answers to his questions, even about the strong odor of marijuana. She was vague about Defendant's employment. He did not recall whether it was Defendant's wife or the codefendant who later told him that the codefendant had spent the previous night in the third bedroom.

TFO Howard said he tried to interview the codefendant later on April 27, 2022, but he then denied he spoke English. He said law enforcement debriefed the codefendant on a later date with his attorney present. TFO Howard said he asked Defendant for consent to search his house at the scene of the stop but Defendant shook his head, which TFO Howard understood to mean, "No." He said when the officers first arrived at Defendant's residence the front door to the garage was closed but the back side of the garage was open. When he arrived, he did not walk through the front door to the garage, which was open at that point, but instead walked around to the back. TFO Howard stated that hardly any part of Defendant's residence, including the open back of the garage,

was visible from the street. He said the officers drove up Defendant's driveway to his house. He stated that the officers performing the knock-and-talk were at Defendant's back door, which was approximately twenty-five yards from the front of the garage.

On redirect examination, TFO Howard testified that the officers at the residence were instructed not to enter the house until a search warrant was obtained. He said it is standard operating procedure for law enforcement to conduct a knock-and-talk at a residence to determine if anyone is inside or outside the residence. He said on the day of the search warrant, officers in unmarked cars were present at the residence before the search warrant was signed. These officers were joined by other officers in marked cars and wearing police attire. TFO Howard said the main reason for sending officers to the residence while obtaining the search warrant is to determine who is there and why they are there for officer safety. He agreed that while officers were at the residence performing the knock-and-talk, they saw an individual in the garage.

TFO Howard stated that he took photographs of the vehicles in the garage to include in the search warrant applications. He said the open trunk and removed panels could be seen from outside the garage. He said he performed a sweep of the garage to confirm there were no people in the vehicles. At that time, he saw that parts of the vehicles were removed and the trunks were open as if for "hides." He stated that after conducting a sweep of the garage, he took photographs of the vehicles. He affirmed that part of the codefendant's truck was outside the garage. TFO Howard stated that Zatarain consented to a search of his truck, and officers found twenty packages of cocaine and a kilogram of a controlled substance was visible on the seat of the Civic.

TFO Howard testified that the affidavit details the investigation, which includes a federal search warrant for the confidential source's residence. The search warrant for the confidential

source's residence and the search warrant for defendant's residence were signed by two different federal Magistrate Judges.

On recross-examination, TFO Howard stated that the Civic containing the package in the back was located just inside the open door of the garage. He denied that officers accessed that package prior to obtaining the search warrant.

## III. FINDINGS OF FACT

Beginning in February 2022, DEA TFO Robert Howard investigated a drug trafficking organization distributing large quantities of cocaine and heroin in the Eastern District of Tennessee. On April 12, 2022, law enforcement executed a federal search warrant at the home of a Knoxville distributer of cocaine and heroin and seized 491 grams of cocaine and 391 grams of marijuana. That individual ("the confidential source") agreed to cooperate and told TFO Howard that "T," was his cocaine supplier and that "T" lived in a house at the end of Holston Court. The confidential source knew "T" through "T's" wife, who performed lawn service for the confidential source. TFO Howard subsequently identified "T" as Terrence Johnson, the Defendant in this case, through examining the confidential source's telephone records. He also determined that the utilities for the residence at the end of Holston Court, which was identified as 144 Holston Court, were registered to Defendant's wife.

On April 27, 2022, DEA task force officers and KPD officers executed an "operation" with the purpose of arresting Defendant and searching his home. Teams of officers were stationed at several locations and communicated by radio. TFO Howard was with the confidential informant. Other officers were surveilling Defendant's residence. KPD Officer Bradley and his partner were stationed near Defendant's residence to conduct a pretextual traffic stop of Defendant's vehicle, and a K-9 unit was also positioned close to the projected location of the stop. The confidential

14

source texted Defendant, stating that he was ready to be resupplied with cocaine and marijuana in a code he and Defendant typically used. The officers surveilling the residence notified the group when Defendant left his residence heading toward the confidential source's residence. Officer Bradley stopped Defendant's vehicle and spoke with Defendant briefly at the driver's side window, obtaining his driver's license. The strong odor of marijuana was coming from the vehicle.

Approximately thirty seconds after stopping Defendant, Officer Bradley removed Defendant from his vehicle, seized his cellphone from his hands, handcuffed him, and moved him away from the vehicle to allow the K-9 unit to perform a free air sniff of the vehicle. Once away from the vehicle, Officer Bradley frisked Defendant, removed the contents of this pockets, and ultimately placed him in a patrol car. Two and one-half minutes from the stop, the K-9 officer led a trained and certified drug detection dog by the driver's side and rear of Defendant's vehicle, and the dog alerted by the driver's door. Officers searched Defendant's vehicle and seized two large bags of marijuana and one bag of cocaine from a backpack on the front passenger seat.

TFO Howard arrived on the scene of the stop after the search of the vehicle and seizure of the controlled substances. He advised Defendant of the *Miranda* warnings and requested consent to search his residence. Defendant denied consent. TFO Howard then proceeded to obtain a search warrant for the residence.

Other officers conducted a "knock-and-talk" at Defendant's residence to determine whether anyone was there. Two officers knocked on Defendant's back door, but no one answered. One of the officers noticed a Hispanic male watching them from Defendant's garage, which is located twenty-five yards up a hill from the residence. The officers knocked on the door of the garage, and Zatarain answered the door. The officers walked with Zatarain around the garage building to the rear, where the large bay door was open. Officers observed several vehicles inside

15

the garage with their trunks open and some with panels removed. One vehicle was parked outside the garage. Zatarain's truck, which had a Texas license plate, was parked partially inside the garage. At the officers' request, Zatarain granted consent to search his truck. Officers located twenty kilograms of cocaine in the false bottom of a toolbox in Zatarain's truck bed.

TFO Howard arrived at Defendant's residence as the officers were searching Zatarain's truck. He performed a sweep of the garage for other individuals and photographed the vehicles inside, the one vehicle outside, and Zatarain's truck. TFO Howard observed a package of suspected controlled substances on the backseat of a Honda Civic, which was registered to Defendant and located inside the garage. After observing the cocaine seized from Zatarain's truck, TFO Howard left the residence to obtain a search warrant. TFO Howard prepared an affidavit for the search of Defendant's residence and outbuildings, four vehicles inside and outside Defendant's garage including the Honda Civic, and for Zatarain's truck. Law enforcement searched Defendant's residence and the vehicles pursuant to the search warrants and seized controlled substances, firearms, and ammunition.

## IV. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Defendant Johnson argues that his Fourth Amendment rights were violated by (1) the stop of his vehicle in the absence of a traffic violation, (2) the officers' warrantless entry onto his property and inspection of his garage, and (3) the search of his residence pursuant to a search warrant lacking in probable cause. The Court examines each of these issues in turn.

16

### A. Stop and Search of Defendant's Vehicle

Defendant argues that Officer Bradley lacked probable cause to believe Defendant committed a traffic violation and, thus, had no basis to stop Defendant's vehicle [Doc. 45 pp. 2, 4]. He asks the Court to suppress all evidence flowing from the unconstitutional seizure of his vehicle and person, including the contraband seized from his residence [*Id.* at 2–3, 5].

An officer may lawfully stop a car when he or she has either probable cause to believe that a traffic violation has occurred or reasonable suspicion of an ongoing crime. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Defendant treats these alternative bases for a vehicle stop as dual mandatory requirements. He maintains that an officer must first have probable cause of a traffic violation to perform a legal vehicle stop. Accordingly, he asserts that because the Government concedes the stop was pretextual and no traffic violation occurred, the stop violated the Fourth Amendment. Well-settled precedent holds otherwise. Law enforcement may temporarily seize a person and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of ongoing criminal activity stemming from "specific and articulable" facts known to the officer at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968). An officer may likewise conduct a *Terry* stop of a vehicle. *Blair*, 524 F.3d at 750 ("Under *Terry*, police may stop a vehicle based on reasonable suspicion of an ongoing crime."); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("It is well settled that the *Terry* doctrine applies to investigative stops of a moving automobile"); *see also United States v. Gomez*, No. 22-20395, 2023 WL 3562984, at * 6–7 (E.D. Mich. May 19, 2023) (holding officer had reasonable suspicion to stop vehicle based upon collective knowledge doctrine and information linking defendant to drug trafficking, including that defendant was in route to deliver drugs to confidential informant).

17

Defendant did not contest the officer's reasonable suspicion for the stop in his motion or at oral argument. However, the Court briefly examines whether reasonable suspicion existed for the sake of completeness. Reasonable suspicion is an amount of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). The Court evaluates the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. As argued by the Government, the "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer "who possesses the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012).

Here, Officer Bradley stopped Defendant's vehicle at the direction of TFO Howard and other officers conducting the operation. At the time, TFO Howard knew that a confidential source said Defendant was his source of supply for cocaine. TFO Howard identified Defendant, whom the confidential informant knew only as "T," from Defendant's telephone number appearing in the confidential source's telephone records. Under TFO Howard's observation, the confidential source arranged a controlled purchase of cocaine and marijuana by texting Defendant that he wanted to be resupplied with these drugs using coded language that he and Defendant previously used. TFO Howard radioed the other officers that the text was sent. Officers surveilling Defendant's residence saw Defendant leave his residence and head toward the confidential

18

informant's home, which was one mile away. After learning Defendant had left his residence, Officer Bradley saw Defendant's vehicle from his position along the route to the confidential informant's house and stopped him. The Court finds that based upon the collective knowledge of the officers involved in the operation, Officer Bradley had reasonable suspicion to stop Defendant for drug trafficking.

Following the stop, officers had probable cause to search Defendant's vehicle based upon either the odor of marijuana coming from the vehicle, *United States v. Crumb*, 287 F. Appx. 511, 514 (6th Cir. 2008) (holding the odor of marijuana alone provides probable cause to search a vehicle) (collecting cases), or the alert by a trained and certified drug detection dog, *United States v. Torres–Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (observing "a positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance). Accordingly, the Court finds the stop and search of Defendant's vehicle comports with the Fourth Amendment.

### B. Knock and Talk and Protective Sweep

Defendant argues that officers violated his rights under the Fourth Amendment by conducting a knock-and-talk at his residence, while knowing that he had expressly declined consent to search his house.[10] Thereafter, the officers went around to the rear of the garage and inspected the inside of his detached garage without a search warrant. Defendant argues the information obtained while officers were illegally on his property cannot form the basis for the search warrant.

---

[10] Although Defendant generally argued in his motion that law enforcement improperly searched his curtilage and garage without a warrant [Doc. 45 pp. 11 – 12], he made specific arguments about the knock-and-talk and security sweep at the suppression hearing.

At the evidentiary hearing, TFO Howard testified that after the stop of Defendant's vehicle and before he obtained a search warrant for Defendant's residence, officers went to Defendant's house and conducted a "knock-and-talk" to determine if anyone was at the residence. He stated this was standard police procedure while a search warrant was sought. The officers knocked on Defendant's back door,[11] but no one answered. According to TFO Howard, one of the officers saw a Hispanic male watching them from the door of the detached garage, which is up a hill and about twenty-five yards away from the house. The officers made contact with the man,[12] whom they identified as Zatarain, and talked with him on the back side of the garage where the large bay door was open. Zatarain consented to the search of his truck, and TFO Howard arrived at the residence while the search was in progress. Through the open garage door, TFO Howard observed that the trunks of some of the vehicles were open and seats and interior panels had been removed. TFO Howard conducted a security sweep of the garage to determine no one was inside or in one of the vehicles. He also photographed the vehicles for the search warrant. After learning a false bottom in the toolbox in Zatarain's truck bed contained twenty kilograms of cocaine, TFO Howard left to obtain the search warrant. The other officers remained on the property to secure it while awaiting the search warrant.

---

[11]    No explanation was provided for the officers' choice of the back door, rather than the front door. The Court notes, however, that the photographs of the residence attached to the search warrant show that a sidewalk leads from the driveway to both the front entrance and to the back entrance [Doc. 46-1 p. 6]. This suggests that a caller could approach either entrance. *C.f. Morgan v. Fairfield County*, 903 F.3d 553, 563 (6th Cir. 2018) (holding officers not permitted to surround house before conducting a knock-and-talk but are limited to the "pathway a visitor would normally use" (internal quotation omitted)). Additionally, Defendant did not object to the officers' use of the back door apart from his objection to their entry onto the property.

[12]    It is not clear whether the officers knocked on the closed garage door facing the house and Zatarain answered or whether Zatarain came out to meet the officers when they approached. Either way, the officers and Zatarain walked around the outside of the garage building to the back.

At the heart of the Fourth Amendment lies the individual's right to be free (from governmental intrusion in his or her home. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018). This Fourth Amendment protection also extends to the curtilage, which is the "area 'immediately surrounding and associated with the home'" and is considered to be "'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred[, and s]uch conduct . . . is presumptively unreasonable absent a warrant." *Collins*, 138 S. Ct. at 1670.

Law enforcement officers, however, are not prohibited from approaching the door of a residence and knocking just like any private citizen. *See Caniglia v. Strom*, 141 S. Ct. 1596, 1598–99 (2021) ("[O]fficers may generally take actions that 'any private citizen might do[.]'" (internal quotation omitted)); *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) ("Consensual encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home"). "The Sixth Circuit has held that a police officer knocking on the front door of a home to speak with the occupant—colloquially referred to as a 'knock and talk' procedure or technique—is generally permissible, provided it is consensual." *United States v. Mills*, 372 F. Supp. 3d 517, 530 (E.D. Mich. 2019) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 713 (6th Cir. 2016)). "[T]he officers' right to enter the property like any other visitor comes with the same limits of that 'traditional invitation': 'typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Morgan v. Fairfield County*, 903 F.3d 553, 563 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 8)).

Following an unsuccessful knock-and-talk, officers should leave the property. *Mills*, 372 F. Supp. 3d at 532.

Here, after the officers received no answer from their knock-and-talk at the residence, they noticed a Hispanic male watching them from the detached garage. Law enforcement may temporarily secure a property to prevent loss of evidence while they seek a search warrant if they have probable cause to believe the property contains contraband.[13] *Illinois v. McArthur*, 531 U.S. 326, 334 (2001). In *McArthur*, officers prevented defendant from entering his home without an escort for two hours while they sought a search warrant, after learning from defendant's wife that the residence contained illegal drugs. *Id*. at 329–30. The Supreme Court found this warrantless detention was reasonable because (1) the officers had probable cause that the residence contained contraband, (2) they reasonably believed defendant would destroy that evidence if permitted unrestrained entry, (3) the restriction on either the property or the individual "was both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests," and (4) the restraint lasted no longer than reasonably necessary for the officers to obtain a search warrant while acting with due diligence. *Id.* at 331–32, 337.

Applying the four factors from *McArthur*, the Court finds the officers' actions in remaining on the property to make contact with Zatarain and briefly detain him while investigating his relationship to the property were reasonable. First, the officers collectively had probable cause to

---

[13] Law enforcement may detain persons on the premises during the execution of a search warrant. *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (holding officer may detain occupant incident to the execution of a search warrant without any additional justification for detention or the intrusiveness of the seizure); *Michigan v. Summers*, 452 U.S. 692, 703 (1981) (detaining occupants during execution of search warrant "represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant"); *United States v. Bohannon*, 226 F.3d 615, 617 (6th Cir. 2000) (holding officers could properly detain visitor attempting to enter residence during execution of a search warrant).

22

search the residence for illegal drugs and evidence of drug trafficking. As part of the operation, the officers knew a confidential source had identified Defendant as his cocaine supplier, that Defendant had left his residence to deliver cocaine and marijuana to the confidential informant, that Defendant was stopped and arrested in route to that transaction, and that a large amount of cocaine and marijuana was seized from his vehicle. Although Defendant argues the confidential source was not reliable, the Court finds that the information from the confidential source was corroborated by the seizure of cocaine and marijuana from Defendant's car.

Second, the officers reasonably believed other persons at the residence could destroy the evidence of drug trafficking if they learned of Defendant's apprehension. Defendant was arrested close to his home in a residential area, and the video reveals that several cars passed during the search of Defendant's vehicle. The confidential source knew Defendant through Defendant's wife, who also lived on the property. Moreover, after the officers searched Zatarain's vehicle pursuant to his consent and found twenty kilograms of cocaine, they reasonably believed him to be involved in the drug trafficking organization.

Third, the officers' interactions with Zatarain were limited and respected Defendant's privacy interest in his property. The officers investigating Zatarain did not enter the garage[14] or search it but, instead, spoke with Zatarain outside the garage in the yard or driveway to identify him and determine his relationship to the property. The officers deemed Zatarain's explanation that he was there to build a retaining wall to be suspect when he could not identify the residents for whom he was working. They also observed that he had a Texas license plate on his truck. The

---

[14]     The Court addresses TFO Howard's security sweep of the garage below.

officers did not ask Zatarain for consent to search the garage[15] but, instead, requested consent to search his truck.

Fourth, the Court finds the officers acted diligently in seeking the search warrant for the property. TFO Howard left to obtain the search warrant just after the officers seized cocaine from Zatarain's truck. Due to the need to keep Zatarain from destroying any evidence and based on the very limited nature of his detention between the officers' observing him at the garage and the search of his truck, the Court finds the questioning and detention of Zatarain on the premises did not violate the Fourth Amendment.

Finally, the Court finds TFO Howard improperly conducted a "security sweep" of the garage. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "Law enforcement may conduct a protective sweep only if there are specific articulable facts from which a reasonable officer could conclude that someone in the home poses a danger to people at the arrest scene." *United States v. King*, 382 F. Supp. 3d 702, 706 (N.D. Ohio 2019). "A protective sweep can only be conducted incident to an authorized search or seizure, such as a lawful arrest or lawful home entry." *Id*. As with other warrantless searches, the government shoulders the burden of proving that a protective sweep was lawful. *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990); *see also King*, 382 F. Supp. 3d at 706.

---

[15] Defendant argues that Zatarain only had authority to consent to a search of his truck and not to the residence, the garage, or the other vehicles [Doc. 45 p. 11]. The Court agrees. While there is some evidence that Zatarain may have been an overnight guest at the residence, he could not consent to the search of the residence or garage over Defendant's objection. *See Georgia v. Randolph*, 547 U.S. 103, 114–15 (2006). The officers knew Defendant had denied consent to search his residence because they were conducting a knock-and-talk to determine who was present while a search warrant was being sought.

24

Here, the Government argues that TFO Howard reasonably conducted a security sweep of the garage to determine whether other people were there. Defendant responds that the officers had no basis to be near the garage, which is detached from the residence and not facing the street. While the Court finds above that the officers' investigation of Zatarain on Defendant's property is reasonable, entry into the garage was not. Even if the officers had authority to arrest Zatarain for the cocaine seized from his truck, TFO Howard lacked a specific, articulable reason for believing that someone posing a danger to them was hidden in the open garage.

During the sweep of the garage, TFO Howard took photographs of the vehicles inside to include in the search warrant, saw that some of the vehicles were in states of disassembly with their trunks open and seats and interior panels removed, and observed a package of suspected controlled substances on the backseat of the Honda Civic. Although the sweep of the garage was improper, the Court finds that all the evidence obtained during the sweep, aside from the package in the Civic, was visible from the officers' lawful position outside the open garage door where they searched Zatarain's truck. TFO Howard testified that the Civic was located just inside the garage. It is not clear whether the package in the Civic was visible from outside the garage. However, the package in the Civic was not included in the affidavit in support of the search warrant. Also, the Court finds that law enforcement would have inevitably discovered the package in the Civic during the execution of the search warrant at the residence. *See United States v. Cooper*, 24 F.4th 1086, 1091, 1093–94 (6th Cir. 2022) (holding the inevitable discovery doctrine applies when the search would have occurred through "lawful means," absent the constitutional violation).

In summary, the Court finds that the officers properly entered Defendant's property to conduct a knock-and-talk and properly remained in the yard or driveway to investigate Zatarain's presence and prevent him from destroying evidence. The officers were lawfully in a position to

see into the open garage bay while searching Zatarain's truck, pursuant to his consent. Although TFO Howard's security sweep of the garage contravened the Fourth Amendment, the Court finds that no evidence was gleaned from the sweep that was not already visible from a lawful vantage point or that would have been inevitably discovered.

### C. Sufficiency of the Search Warrant

A search warrant issued in compliance with the Fourth Amendment must be based on "particularized facts" that demonstrate "'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Defendant contends that the affidavit in support of the search warrant failed to provide probable cause for the search warrant's issuance for two reasons: (1) the information from the confidential informant was not sufficiently reliable and (2) the affidavit fails to establish a nexus between the residence and drug trafficking.

The Court begins by observing that an issuing judge's determination that probable cause exists is entitled to "'great deference.'" *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238-39. In making this determination, the Court considers only the information that was before the issuing judge—in other words, only what is

26

contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n.13. Thus, the Supreme Court has observed that "probable cause is a flexible, common-sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. *Gates*, 462 U.S. at 238. With these principles in mind, the Court turns to the search warrant in this case.

### (1) Reliability of Confidential Source

Defendant argues that TFO Howard's affidavit fails to show that the confidential source[16] was reliable [Doc. 45 pp. 7–10]. He asserts that the confidential source was not identified to the issuing judge, the affidavit provides no information of past reliability or basis of knowledge, and the only information corroborated by law enforcement is the innocent detail of Defendant's address [*Id.* at 8–9]. The Government contends that the affidavit reveals that law enforcement corroborated the information from the confidential source by confirming the utility records and by seizing cocaine and marijuana from Defendant's vehicle [Doc. 46 p. 7].

---

[16] TFO Howard's affidavit references two confidential sources [Doc. 46-1 p. 54]. The first confidential source ("CS1") provided information that the second confidential source ("CS2") was distributing cocaine and heroin in Knoxville [*Id.* at ¶8]. This is the sole reference to CS1 in the affidavit. Following a search of CS2's residence pursuant to a federal search warrant, CS2 agreed to cooperate and provided information regarding Defendant [*Id.* at ¶9A]. CS2 is the confidential source whose reliability is discussed above.

27

If probable cause to issue a search warrant is gained from information provided by a confidential source, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009); *see also Gates*, 462 U.S. at 233 (holding that a confidential informant's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); *Allen*, 211 F.3d at 972-73. An informant's veracity or reliability and basis of knowledge are not rigid categories. *Id.* Instead, deficiencies in one aspect can be made up by a strong showing in the other. *Gates*, 462 U.S. at 232-33; *Allen*, 211 F.2d at 981. Additionally, an affidavit that gives little information on an informant's past reliability may still establish the informant is reliable by independent corroboration of the informant's information. *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006).

Here, Defendant is correct that the affidavit lacks independent information on the confidential source's veracity, such as information the source previously provided reliable information. However, the affidavit does provide some general information on the confidential source's basis of knowledge because it states that the source identified Defendant as his supplier for cocaine [Doc. 46-1 at ¶9A]. The main support for the reliability of the confidential source's information, however, is the officer's corroboration of information from the source. The confidential source told officers that Defendant lived at the end of Holston Court, and TFO Howard's review of utility records corroborated that Defendant lived at 144 Holston Court, which is at the end of that road [*Id.*]. Defendant argues that the confirmation of this innocent detail is insufficient to corroborate the confidential source's allegations that he is involved in drug trafficking. While perhaps not sufficient alone, the corroboration of nonincriminating facts also supports probable cause. *Gates*, 462 U.S. at 243-44.

The Court finds, however, that the information from the confidential source is primarily corroborated by the controlled drug transaction on April 27, 2022. An "affidavit need not include . . . attestations [of the informant's reliability] if it sufficiently details a controlled buy that supports the informant's credibility." *United States v. Moore*, 999 F.3d 993, 998 (6th Cir. 2021). TFO Howard's affidavit relates that on that date, the confidential source texted Defendant to coordinate a purchase of cocaine [*Id*. at ¶10]. Officers surveilling Defendant's residence saw him leaving his residence in route to meet the confidential source [*Id*.]. Officers stopped Defendant and a search of his vehicle yielded ten ounces of cocaine and two pounds of marijuana [*Id*.]. A controlled drug transaction corroborates the information from a confidential informant and provides probable cause for a search warrant. *Coffee*, 434 F.3d at 894; *see also Moore*, 999 F.3d at 997 (observing numerous cases hold "a confidential informant's credibility can be corroborated with a controlled buy") (collecting cases).

Thus, the Court finds information from the confidential source was corroborated by a controlled buy, police surveillance, and utility records. The Court finds this corroboration reduced the chance that the information from the confidential source was a "reckless or prevaricating tale" and provided a substantial basis for the issuing judge to credit the information from the source, when assessing probable cause. *See Gates*, 462 U.S. at 244–45 ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" (quoting *Jones v. United States*, 362 U.S. 257, 269, 271 (1960)). Accordingly, the Court finds the affidavit shows the confidential source was reliable and his information could and does support probable cause for the issuance of the search warrant for Defendant's residence.

29

*(2) Nexus*

Defendant also argues that the affidavit fails to provide a nexus between his residence and evidence of drug trafficking [Doc. 45 pp. 10–11]. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*). In other words, probable cause requires a "'nexus between the place to be searched and the evidence sought.'" *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances. *Id.* The Court must assess "'whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *United States v. Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

Here, four pieces of information from the affidavit establish a nexus between Defendant's residence and drug trafficking: (1) Defendant left from his residence to bring controlled substances to the confidential source in response to the source's text requesting drugs and officers stopped him with a large amount of controlled substances [Doc. 46-1 ¶10]; (2) officers observed five vehicles in and around Defendant's garage with trunks open and seats and interior panels removed [*Id.* at ¶11]; (3) twenty kilograms of suspected cocaine were seized from a toolbox in the back of Zatarain's truck, which was parked in or around the Defendant's garage; and (4) based on his

training and experience, TFO Howard knows drug traffickers store drugs, currency, firearms, and other evidence of drug trafficking in their residences [*Id.* at ¶4].

Evidence of a "direct line" of travel from a residence to the site of a drug transaction as established by police surveillance can support a nexus between a residence and drug trafficking. *United States v. Miller*, 850 F. App'x 370, 374 (6th Cir. 2021); *see also United States v. Houser*, 752 F. App'x 223, 225–26 (6th Cir. 2018) (finding nexus when the defendant engaged in drug transaction on the side of his apartment building then returned directly to his apartment). Here, the affidavit relates that after the confidential source sent a text message coordinating a purchase of cocaine, officers observed Defendant leave his residence and drive "to meet" the source [Doc. 46-1 ¶10]. Officers stopped Defendant after he left his residence and seized ten ounces of cocaine and two kilograms of marijuana from his car [*Id.*]. Seizure of a large quantity of controlled substances from a known cocaine supplier also supports finding a nexus between the supplier's residence and drug trafficking. *United States v. Davis*, 751 F. App'x 889, 891–92 (6th Cir. 2018) (determining that stop of large-scale heroin dealer, as previously characterized by an informant, and seizure of eleven kilograms of cocaine, along with a prior seizure of drug proceeds from the dealer, permitted issuing judge to infer that the dealer kept drugs or evidence of drug trafficking at his residence).

The Court agrees with Defendant that the affidavit does not show that the confidential source was ever in Defendant's residence. However, according to the affidavit, officers, who were on Defendant's property the day the search warrant was sought, saw vehicles in various states of disassembly and found a large amount of cocaine in one vehicle [*Id.* at ¶11]. The issuing judge could reasonably infer that the vehicles parked near the truck containing cocaine were being prepared to also hide controlled substances. Defendant discounts this information because he

contends it was gained from an illegal warrantless search of his property. However, as discussed above, the Court finds this information was not the product of an unlawful search.

Finally, based upon his training and experience, TFO Howard states that drug traffickers keep controlled substances, proceeds, and other evidence of drug trafficking in their homes [Doc. 46-1 ¶4). A person's status as a drug trafficker alone is insufficient to provide a nexus to search their home. *Brown*, 828 F.3d at 383.[17] In addition to showing that the defendant was trafficking drugs and lived at the residence, the affidavit must provide "evidence showing a connection between [the] alleged drug trafficking" and the residence. *United States v. Sumlin*, 956 F.3d 879, 887 (6th Cir. 2020)). "[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Brown*, 828 F.3d at 384. Here, other specific evidence is available in the form of police observation of a large quantity of cocaine in a truck on the premises. While that truck belonged to Zatarain, it was parked beside four other vehicles, some of which appeared to be staged for hiding controlled substances. Accordingly, the Court finds that the affidavit contains specific and concrete information that evidence of drug trafficking would be found at Defendant's residence.

In summary, the Court finds that TFO Howard's affidavit shows the reliability of the confidential source and a nexus between Defendant's residence and evidence of drug trafficking.

---

[17] Cases in the Sixth Circuit vary in the amount and type of evidence needed to establish nexus in the absence of a drug transaction or the presence of drugs observed on the premises. *See United States v. Sheckles*, 996 F.3d 330, 341–42 (6th Cir.) (recognizing that the nexus determination is "fact-specific"), *cert. denied*, 142 S. Ct. 717 (2021); *see also United States v. Sanders*, 59 F.4th 232, 239 (6th Cir.) (finding no nexus from defendant's status as a drug trafficker when the reliability of the informant was not established, no drug transactions occurred on the premises, and the affidavit did not establish that defendant resided at the apartment), *vacated & pending rehg en banc*, 68 F.4th 1030 (6th Cir. 2023). In the case before the Court, officers observed cocaine on the premises in Zatarain's truck along with several other vehicles staged for placement or removal of controlled substances from within. Thus, the nexus to Defendant's residence is well established.

32

Thus, the affidavit provided probable cause for the issuance of a search warrant for Defendant's residence.

## IV.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that law enforcement had reasonable suspicion to stop Defendant's vehicle and probable cause to search the vehicle.  The Court also finds officers could enter Defendant's property to conduct a knock-and-talk and remain on Defendant's property to prevent destruction of evidence while awaiting a search warrant.  While a protective sweep of Defendant's garage was improper, information gleaned from that unlawful entry was also otherwise lawfully obtained. Finally, the Court finds law enforcement properly searched Defendant's residence and vehicles pursuant to a valid search warrant.  Accordingly, the undersigned respectfully **RECOMMENDS** that that Defendant Johnson's Motion to Suppress [Doc. 45] be denied.[18]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[18] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).